Filed 4/20/23 In re V.H. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re V.H., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E079974 |
| Plaintiff and Respondent, | (Super.Ct.No. J290821) |
| v. | OPINION |
| P.H. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County. Lynn M. Poncin, Judge. Affirmed.

Richard L. Knight, under appointment by the Court of Appeal, for Defendant and Appellant P.H.

Paul A. Swiller, under appointment by the Court of Appeal, for Defendant and Appellant M.P.

1

Tom Bunton, County Counsel and Kaleigh Ragon, Deputy County Counsel for Plaintiff and Respondent.

M.P. (mother) and P.H. (father) appeal the juvenile court's order terminating their parental rights over their infant daughter, Violet H., who was removed at birth. They argue there is insufficient evidence to support the court's finding the Indian Child Welfare Act (ICWA)[1] did not apply because San Bernardino County Children and Family Services (the department) failed to conduct an adequate inquiry into Violet's possible Native American ancestry. In addition, father argues the court erred in determining the parental-benefit exception did not apply to his relationship with Violet. (Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i), unlabeled statutory citations refer to this code.) We conclude both arguments lack merit and affirm.

## I

## FACTS

A.    *Detention, Jurisdiction, and Disposition*

When Violet was born in October 2021, she and mother tested positive for methamphetamine. During an interview at the hospital, mother admitted using methamphetamine a few days before Violet's birth. She said father had recently been arrested for violating probation and was currently incarcerated. The department's investigation revealed that mother's substance abuse issues were the cause of her failure

---

[1] 25 U.S.C. § 1901 et seq.

to reunify with her two other children, Violet's older half siblings.[2] On October 5, 2021, the department obtained a warrant and took Violet into protective custody, and on October 8, the juvenile court found a prima facie case to detain the infant from the parents' custody.

At the jurisdiction and disposition hearing on December 13, 2021, the court took jurisdiction over Violet under section 300, subdivisions (b) and (j) and sustained failure to protect allegations against both mother and father, as well as a neglect of siblings allegation against mother. The court removed Violet from both parents and bypassed reunification services for mother under section 361.5, subdivisions (b)(10) (failure to reunify with sibling) and (b)(11) (termination of parental rights over a sibling). It found father was merely an alleged father and thus not entitled to reunification services.

B.      *Termination of Parental Rights*

In April 2022, the department filed a section 366.26 report informing the court that Violet was thriving in her foster home. She was healthy and meeting developmental milestones. She was bonded to her caregivers, and they wanted to adopt her and give her a permanent home. Mother and father had been visiting Violet regularly and there had been no issues with their time together. However, based on Violet's positive experience in her foster home and the fact she hadn't spent any time living in the parents' care, the department recommended the court terminate mother's and father's parental rights and select adoption as her permanent plan.

_____

[2] One of the children was adopted by the maternal grandmother, and the other ultimately aged out of the foster care system.

3

The same month, father filed a section 388 petition asking the court to change its order finding him an alleged father, find him instead to be a presumed father, and order the department to provide him with reunification services. He alleged that since the jurisdiction and disposition hearing he had consistently visited with Violet, provided her with diapers, and generally treated her as his own child. He attached photographs of him and Violet taken during visits to show they were bonded and that it was in her best interests to give him an opportunity to reunify with her.

The court heard father's petition on June 21, 2022. It found he was Violet's presumed father, but it denied his request for services on the ground he hadn't shown reunification would be in the infant's best interests.

Violet's permanency planning hearing took place shortly after her first birthday, on October 6, 2022. After finding ICWA did not apply (see part II.B, *post*), the court heard testimony from the parents. Father said he had consistently visited with his daughter and she was always happy to see him. He said it seemed like she didn't want to leave him at the end of the visits because she would get "fussy" when he tried to return her to her caregivers. He argued the parental-benefit exception applied and asked the court to select guardianship as Violet's permanent plan instead of adoption. At the conclusion of the hearing, the court found father had failed to demonstrate the exception applied and terminated both parents' parental rights.

4

C.     *The Department's ICWA Investigation*

1.     *Mother's side*

On multiple occasions mother denied having any Native American ancestry. She did, however, say she thought father had a connection to a tribe because his "adult children received Native American funds." In an effort to interview mother's extended family members, the social worker asked her for the contact information of a cousin she had mentioned. On May 12, 2022, mother responded with a text saying "there's nobody on my side [with Indian heritage] so I don't know who told you that."

On June 9, 2022, the social worker asked the maternal grandmother for the cousin's contact information. The maternal grandmother said she was unaware of any such relative and said there was no Native American heritage on their side of the family.

2.     *Father's side*

At the detention hearing, father said he had Cherokee heritage through his mother and grandmother, who were both enrolled members of a tribe, but were now deceased. He said his aunts and uncles would have information about the tribe but he couldn't contact them until he was released from custody and had access to his phone. The court ordered the department to follow up with father and ordered father to inform the social worker of any relevant tribal information he might obtain.

The social worker interviewed father a few weeks later, on October 28, 2021, to get additional information that might shed light on his Native American heritage. She also asked him specifically for the contact information of the aunt he mentioned at the

5

detention hearing. Father refused, saying he wouldn't provide any information while he was incarcerated.

The social worker followed up with father on May 2, 2022. This time, he claimed to have Cherokee and Blackfoot heritage but still would not provide any additional information about his family or his connection to the tribes. At some point, he sent a text message to the social worker indicating his aunt might have tribal information. On May 12, the social worker responded, asking him for the aunt's contact information, but he never replied. On June 9, the social worker sent another text asking father for the aunt's contact information, and again he didn't respond.

On July 21, the social worker interviewed father's adult daughter, Valerie—who had recently sought placement of Violet—about her Native American ancestry. Valerie said she had ancestry with a Cherokee tribe, and she provided the phone number for her Aunt Grace, who might have more information. The social worker spoke with Grace the same day, and Grace reported being a registered member of the Cherokee tribe.

At a hearing on July 22, father told the court that his grandfather, mother, and Aunt Grace had all been enrolled members of Cherokee Nation in Oklahoma. He also said he thought his mother or Aunt Grace might have registered him as a member. In response to this information, the court noted that "in an abundance of caution" it was continuing Violet's permanency planning hearing and ordering the department to provide notice to Cherokee Nation.

6

The department sent notice to Cherokee Nation, as well as the Eastern Band of Cherokee Indians and the United Keetowah Band of Cherokee. It also sent notice to the Blackfeet Tribe of Montana and the Bureau of Indian Affairs. The notices contained father's name, address, and place and date of birth as well as the information the social worker was able to obtain about the relatives he believed were registered with Cherokee Nation. Specifically, the notice contained his mother's name and place and date of birth; his Aunt Grace's full name; and the names and places and dates of birth for both his grandparents. The Blackfeet Tribe of Montana did not respond. All three Cherokee tribes responded saying Violet was not an enrolled member and they would not intervene.

At the permanency planning hearing, the court concluded the department had conducted a sufficient inquiry into Violet's possible Native American heritage and found ICWA did not apply.

## II

## ANALYSIS

A.    *The Parental-Benefit Exception*

Father argues the record doesn't support the court's conclusion the parental-benefit exception did not apply to his relationship with his one-year-old daughter. We disagree.

"'The objective of the dependency scheme is to protect abused or neglected children and those at substantial risk thereof and to provide permanent, stable homes if those children cannot be returned home within a prescribed period of time.' [Citation.]

7

When the child is removed from the home, the court first attempts, for a specified period of time, to reunify the family." (*In re Celine R.* (2003) 31 Cal.4th 45, 52.) After reunification services are denied or terminated, "'the focus shifts to the needs of the child for permanency and stability.'" (*Ibid.*) Adoption is preferred once reunification services have been terminated, and "adoption should be ordered unless exceptional circumstances exist." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 51.)

Under section 366.26, subdivision (c)(1), the juvenile court must terminate parental rights if it finds "by clear and convincing" evidence it is likely the child will be adopted. However, "when a court proceeds to select a permanent placement for a child who cannot be returned to a parent's care, the parent may avoid termination of parental rights in certain circumstances defined by statute. One of these is the parental-benefit exception." (*In re Caden C.* (2021) 11 Cal.5th 614, 617 (*Caden C.*).) This exception applies when (i) the parent has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship" and (ii) the court finds that the parent-child relationship presents a "*compelling reason* for determining that termination [of parental rights] would be detrimental to the child." (§ 366.26, subd. (c)(1)(B)(i), italics added.)

Recently, in *Caden C.*, our Supreme Court provided guidance for applying this exception. "The language of [the parental-benefit] exception, along with its history and place in the larger dependency scheme, show that [it] applies in situations where a child cannot be in a parent's custody but where severing the child's relationship with the

8

parent, even when balanced against the benefits of a new adoptive home, would be harmful for the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 630.) The court indicated we should continue to be guided in our understanding of these elements by one of the foundational appellate court opinions discussing the parental-benefit exception, *In re Autumn H.* (1994) 27 Cal.App.4th 567 (*Autumn H.*), which emphasized that in "assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home." (*Caden C.*, at p. 632.)

"'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[]' the child, the court should not terminate parental rights. [Citation.] That subtle, case-specific inquiry is what the statute asks courts to perform: does the benefit of placement in a new, adoptive home outweigh 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]' [Citation.] When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent." (*Caden C.*, *supra*, 11 Cal.5th at pp. 633-634.) Factors relevant to this inquiry include the child's age and the amount of time they spent in the parent's custody, the quality of interaction between parent and child, and the child's particular needs. (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.)

9

We review the juvenile court's finding on the frequency of contact and the existence of a beneficial relationship for substantial evidence, and we apply the abuse of discretion standard to the court's decision whether terminating parental rights would be detrimental to the child so as to outweigh the permanency benefits of adoption. (*Caden C.*, *supra*, 11 Cal.5th at pp. 640-641.)

Here, because father consistently visited Violet, the question we face is whether he demonstrated that he shared such a substantial, positive emotional attachment with her that the harm of severing the parent-child relationship outweighed the benefit of stability in adoption. Given that Violet was an infant and had spent no time in his care save the supervised visits, father cannot make the required showing. He points to the fact that Violet enjoyed their visits and would get fussy when they came to an end, but infants cry for a number of reasons and those facts fall well short of demonstrating his relationship with Violet was so positive and substantial that it outweighed the benefits of living in a permanent adoptive home. Simply put, where a one-year-old baby has never lived in the parent's care, the parent must show more than positive supervised visits to trigger the exception. Positive contacts and evidence of a bond do not, by themselves, constitute a compelling reason to deprive a dependent child of the permanency benefits of adoption; there must also be evidence that the child will suffer detriment if the parent-child relationship is severed. (E.g., *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1316.)

B.   *ICWA*

Mother and father argue the court's finding that ICWA did not apply is not supported by the record because the department's ICWA investigation was inadequate. Again, we disagree.

We review a juvenile court's finding that ICWA does not apply for substantial evidence. (*In re Austin J.* (2020) 47 Cal.App.5th 870, 885 (*Austin J.*).) The parent bears the burden of demonstrating the lack of solid, credible evidence to support the finding, and we resolve all evidentiary conflicts in favor of affirmance. (*Ibid.*)

ICWA establishes minimum federal standards a state court must follow before removing Indian children from their families. (*In re T.G.* (2020) 58 Cal.App.5th 275, 287 (*T.G.*).) California law implementing ICWA also imposes requirements to protect the rights of Indian children, their families, and their tribes. (See Welf. & Inst. Code, §§ 224-224.6.) ICWA defines "Indian child" as any unmarried person under 18 who "is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4); Welf. & Inst. Code, § 224.1, subd. (b).)

Federal regulations require state courts to ask each participant "at the commencement" of a child custody proceeding "whether the participant knows or has reason to know that the child is an Indian child." (25 C.F.R. § 23.107(a).) California law requires the court to make the same inquiry of each participant at their "first [court] appearance." (Welf. & Inst. Code, § 224.2, subd. (c).)

11

California law also imposes on the courts and child welfare departments "an affirmative and continuing duty to inquire whether a child . . . *is or may be* an Indian child." (§ 224.2, subd. (a), italics added.) This duty, commonly referred to as the initial inquiry, "begins with the initial contact" and applies through termination of parental rights. (*Ibid.*) The scope of the duty includes, "*but [is] not limited to*, asking the party reporting child abuse or neglect whether [they have] any information that the child may be an Indian child." (*Ibid.*, italics added.)

If as a result of the initial inquiry, the court or department concludes there is "reason to believe" the child is or may be an Indian child—that is, they conclude there is "information suggesting that either the parent of the child or the child is a member or may be eligible for membership in an Indian tribe"—the department must conduct a further inquiry. (Welf. & Inst. Code, § 224.2, subd. (e)(1).) This further inquiry includes interviewing the parents and extended family members to gather the information necessary for an ICWA notice, contacting the Bureau of Indian Affairs to gather the names and contact information of the pertinent tribes, informally contacting the tribes, and contacting any other person who may reasonably be expected to have information regarding the child's membership status or eligibility. (Welf. & Inst. Code, § 224.2, subd. (e)(2)(A)-(C).)

These ICWA inquiries enable the department and the juvenile court to determine whether notice to the tribes is necessary. (*In re Austin J.*, *supra*, 47 Cal.App.5th at pp. 883-884.) The purpose of notice is to enable the tribes "to determine whether the

12

child involved in a dependency proceeding is an Indian child and, if so, whether to intervene in, or exercise jurisdiction over, the matter." (*T.G.*, *supra*, 58 Cal.App.5th at p. 288.) Because ICWA defines "Indian child" in terms of tribal membership, not race or ancestry, "the question of membership is determined by the tribes." (*T.G.*, at pp. 279, 294; see also *Santa Clara Pueblo v. Martinez* (1978) 436 U.S. 49, 65-66, fn. 21 [the Indian tribe is final arbiter of its membership rights].) Notice to the tribes is therefore crucial to "effectuating ICWA's purpose" because it enables the tribe to make the determination and decide whether to intervene. (*T.G.*, at pp. 288-289.)

Here, the record demonstrates the department did a thorough investigation into Violet's possible Native American heritage. Father's claim of Cherokee and Blackfeet heritage during the initial inquiry prompted the social worker to conduct a further inquiry. The results of that inquiry, combined with father's statements to the court at the July 22 hearing, prompted the court to order the department to provide formal notice to Cherokee Nation. The social worker sent formal notice to Cherokee Nation and two other Cherokee tribes containing all the information father and his relatives had provided, and all three Cherokee tribes responded Violet was not enrolled and they would not intervene.

Though it's undisputed the social worker asked father repeatedly for his relative's contact information and ultimately spoke with the only two relatives for which he provided information (his daughter Valerie and his Aunt Grace), father argues on appeal that there may have been additional family members with information and the social worker should have tried to find them. He speculates he *may* have more than one adult

13

child and more than one aunt, and he argues the social worker should have determined whether or not that was the case.

Simply put, that is not the social worker's job. The department was required to conduct a "meaningful investigation" into father's claim of Cherokee and Blackfoot ancestry. (*In re Michael V.* (2016) 3 Cal.App.5th 225, 236.) But "social workers are not required 'to cast about' for investigative leads to satisfy their duties of inquiry." (*In re Allison B.* (2022) 79 Cal.App.5th 214, 220, 294, quoting *In re A.M.* (2020) 47 Cal.App.5th 303, 323; see also *In re Q.M.* (2022) 79 Cal.App.5th 1068, 1084.) The record in this case contains no indication father had another older relative besides Grace or another adult child besides Valerie, and tellingly, he doesn't even claim on appeal such relatives exist. But if even they did exist, a child welfare department cannot be expected to uncover information a parent is hiding. (See *In re N.G.* (2018) 27 Cal.App.5th 474, 482 [departments must "take[] reasonable steps to ascertain whether" a child has possible Native American ancestry].)

We also reject the claim, made by both mother and father, that the social worker's further inquiry was inadequate because she failed to ask Grace for additional information, such as her Cherokee Nation enrollment number. This argument fails because the purpose of conducting a further inquiry is to determine whether it's necessary to send notice to a tribe. Here, the department sent notice to Cherokee Nation that contained enough information about father and Violet for the tribe to determine whether Violet was enrolled or eligible for enrollment and thus whether they would intervene. The notice

14

contained father's name, address, and place and date of birth; the full name and place and date of birth of his mother (whom he claimed was registered); the full name of his aunt (who claimed to be registered with the tribe); and the full name and place and date of birth for his grandfather (whom he claimed was registered). Cherokee Nation had the full names of three family members father claimed were registered and they nevertheless determined Violet was not eligible for enrollment. As a result, mother and father cannot demonstrate that asking Grace whether she had an enrollment number "would have produced different results." (*Nicole K. v. Superior Court* (2007) 146 Cal.App.4th 779, 784.)

We conclude the court's ICWA finding is supported by substantial evidence.

## III

## DISPOSITION

We affirm the order terminating parental rights.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

SLOUGH
Acting P. J.

We concur:

FIELDS
J.

MENETREZ
J.

15